**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GRUBHUB HOLDINGS INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., et al.,<br><br>Defendant. | NO. 1:19-CV-07273<br><br>Judge Edmond E. Chang |

**ORDER**

In advance of the pretrial conference, this Order addresses the motions in limine filed by the Plaintiff Belk, Inc., deciding most of them and reserving a few.

**Plaintiff's Motion in Limine No. 1 (Exclude Honor All Cards Rules and Default Interchange Protected Small Banks from Competition).** The Plaintiff moves to bar as irrelevant evidence or argument that the Honor All Cards rules and default interchange protected smaller issuers from competition and helped them stay viable in the relevant markets for credit and debit issuance. R. 201, Pl.'s Mot. No. 1 at 3. During discovery, two of the Defendants' experts, David Kaplan and Kenneth Elzinga, and one of the Defendants' fact witness, Celeste Schwitters, testified to this effect. *Id.*; *see* R. 243-13, Defs.' Opp. Exh. 12, Kaplan Rep. ¶ 551; R. 188-1, Elzinga Reply Rep. ¶¶ 166–67; R. 198, Murphy Rep. ¶ 393; R. 204, Pl.'s Mots. Exh. A, Schwitters Dep. at 188:4–23.

According to the Plaintiff, there are several mentions of the effect that Visa's and Mastercard's conduct had on small issuers in the Defendants' evidence. For example, in Kaplan's report, he opined on a Mastercard presentation, which noted the possibility that "small issuers could be forced out of [the] market as large players form proprietary networks" if closed-loop systems are created. Kaplan Rep. ¶ 551. Elzinga opined that "the Honor All Issuers rules make it possible for smaller issuers to offer cardholders the same widely accepted Visa and Mastercard payment cards that the largest issuing banks offer," and that "[a]ccepting debit cards issued by only certain issuers may … prevent smaller debit card issuers from competing with larger banks." Elzinga Reply Rep. ¶ 166–67. And Schwitters testified that Visa's Honor All Cards

rules "absolutely" help community banks and the credit unions compete in the credit and debit card markets. Schwitters Dep. at 188:4–23.

The Plaintiff argues that, under Evidence Rules 402 and 403, the Defendants cannot defend themselves by claiming that restraints of trade or price-fixing allow non-competitive market participants to survive. Pl.'s Mot. No. 1 at 3. The Defendants argue in response that this evidence shows that the Honor All Cards rules and default interchange have procompetitive benefits, namely, increased output, reduced two-sided prices, and increased consumer choice, because the practices allow a variety of issuers—small and large—to offer payment card products to consumers. R. 243, Defs.' Opp. No. 1 at 1.

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Under Rule 402, relevant evidence is admissible, and irrelevant evidence is not admissible. Fed. R. Evid. 402. But even if evidence is relevant, the Court should exclude it "if its probative value is substantially outweighed" by the dangers of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

At the liability phase of this trial,[1] the central issue is whether the Defendants' Honor All Cards rules and default interchange constitute anticompetitive agreements between the Defendants and issuing banks. *See* R. 206, Joint Pretrial Statement at 5–6.[2] The antitrust claims in this case require the Plaintiff to follow the rule-of-reason analysis to establish a violation. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). When a *per se* violation is not at issue, courts apply a three-step, burden-shifting framework to decide whether a restraint violates the rule of reason. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (commonly referred to as the *Amex* case). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If the plaintiff carries that initial burden, then "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* And "[i]f the defendant makes

[1]This trial will be bifurcated into a liability phase and a damages phase. R. 152, 05/26/2026 Minute Entry.

[2]Citations to the motions and related briefing are to the page numbers as marked at the bottom of the document. Citations to the exhibits and other filings refer to the PDF page numbers at the top of the document.

this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.* at 542.

The Defendants argue that the procompetitive benefits of the Honor All Cards rules and default interchange include "enabling small issuers to offer cards with seamless acceptance." Defs.' Opp. No. 1 at 2. The defense asserts that the ability of small issuers to offer universally accepted cards affects competition because if cardholders do not have certainty about whether their payment cards will be accepted, the cards will become less valuable, leading to a decline in usage and merchant acceptance. *Id.* And the Defendants argue that they will put forth evidence at trial that the Honor All Cards rules and default interchange "enhance[d] interbrand competition and lead to greater consumer choice, increased output, and reduced prices." *Id.* at 3.

In particular, to start, David Kaplan's and Kenneth Elzinga's expert opinions support the Defendants' argument that the Honor All Cards rules and default interchange are supported by a procompetitive rationale. In his report, Kaplan opined that forcing-out small issuers due to the creation of closed-loop systems would result in "consumers … hav[ing] less choice among card issuers" and result in the reduction of the "number of credit card accounts/cards in [the] market." Kaplan Report ¶ 551. And in Elzinga's report, he opines that if small banks are excluded, "[t]he fragmented provision of payment card services would deprive the platforms of the benefit of network externalities and reduce the benefits that payment card platforms can provide to cardholders and merchants." R. 243-6, Defs.' Opp. Exh. 5, Elzinga Opening Report at 254–55. Elzinga describes the "open" feature of Visa and Mastercard as "facilitat[ing] participation by many banks and the vigorous competition among them." *Id.* at 255. In his reply report, Elzinga further opines that "the Honor All Issuers rules make it possible for smaller issuers to offer cardholders the same widely accepted Visa and Mastercard payment cards that the largest issuing banks offer," Elzinga Reply Report ¶ 167, and he contextualizes this opinion by explaining that if the Honor All Cards rules are dropped, there would be consumer uncertainty on rewards cards—a procompetitive means through which prices are lowered for customers, *id.* ¶ 169.

In addition, Celeste Schwitters (Visa's head of Community Accounts) testified that community banks primarily compete with numerous institutions, including "the local bank down the road," "[f]intechs," and "larger institutions," for business. R. 243-9, Defs.' Opp. Exh. 8, Schwitters Dep. at 105:5–17. Later during the deposition,

Schwitters also testified that Visa's Honor All Cards rule helps community banks and credit unions compete in the credit-card and debit-card markets. *Id.* at 188:4–23. Taken together, Schwitters opines that the Honor All Cards rule allows there to be more competition in the credit-card and debit-card markets.

In response to all this, the cases cited by the Plaintiff do not warrant exclusion of the proposed evidence. In *2311 Racing LLC v. National Association for Stock Car Auto Racing, LLC*, the court held that the defendant's witness would not be allowed to argue that increasing payments to the defendant itself is a procompetitive justification because it was "really just an argument that all the industry participants are better off (either directly … or indirectly)." 2025 WL 3188412, at *2 (W.D.N.C. Nov. 14, 2025). But the Plaintiff here does not explain how the Honor All Card rules and default interchange allow *all* industry participants to be better off. Instead the proposed evidence—if accepted by the jury, which it could quite reasonably do—would show that *competition* is increased by the challenged practices. In *In re Lidoderm Antitrust Litigation*, the court excluded evidence of a settlement and rejected the argument that it was "procompetitive by removing litigation uncertainty *for defendants*." 2018 WL 7814761, at *7 (N.D. Cal. Feb. 7, 2018) (emphasis in original). That is not the purpose or nature of the proffered evidence here. And in *United States v. Visa U.S.A.*, the court held that requiring member banks not to compete by offering American Express and Discover branded cards was a horizontal restraint that was not justified by the goal of keeping a level playing field between various competitors. 163 F. Supp. 2d 322, 405 (S.D.N.Y. 2001). A refusal to offer consumers American Express and Discover branded cards *decreases* competition, whereas the defense's proposed evidence in this case—if accepted by the jury—shows that the Honor All Cards rules and default interchange end up increasing transactions, lower two-sided prices (when viewed as a two-sided platform), and increases cardholder choices. Finally, the Honor All Cards rules and default interchange do not *guarantee* that any issuer receives a share of the trade, which is not allowed. *See United States v. Am. Airlines Grp., Inc.*, 121 F.4th 209, 225–26 (1st Cir. 2024) (rejecting the defendants' argument that their collaboration generated a procompetitive benefit by better allowing it to compete with another airline); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 317 (D.R.I. 2019) (precluding experts from testifying that "ruinous competition" between manufacturers is procompetitive and not anticompetitive).

In sum, Plaintiff's Motion No. 1, R. 201, is denied.

**Plaintiff's Motion in Limine No. 2 (Exclude Certain Opinions of Experts David Kaplan and Garrison Harvey During Liability Phase).** The

Plaintiff seeks to prevent defense experts David Kaplan and R. Garrison Harvey, who are primarily damages experts, from testifying during the liability phase. R. 201, Pl.'s Mot. No. 2 at 7. The Defendants oppose the motion because Kaplan and Harvey offer opinions that not only are relevant to specific damages amounts, but instead are relevant to rebutting the Plaintiff's evidence on the "but-for" world, that is, what would the market be but-for the challenged restraints, which goes to establishing liability. R. 243, Defs.' Opp. No. 2 at 9. The Defendants clarify that they do not intend to introduce any opinions about damages from Kaplan and Harvey during the liability phase. *Id.* at 9–10. In response, the Plaintiff argues that Harvey does not offer any opinions on liability, R. 264, Pl.'s Reply No. 2 at 8–10, and that Kaplan is a damages expert who should be excluded from the liability phase, *id*. at 10–11.

Although the dispute over specific damages amounts will of course be litigated in the damages phase (if liability is found), at the liability stage it "is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* facts of the defendant." *MCI Commc'ns Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (emphasis in original). Proof of fact of some damage "is an essential element to establishment of antitrust liability," and "contains two distinct aspects." *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 147 (N.D. Ill. 1980). First, an antitrust plaintiff "must demonstrate that they have suffered some injury." *Id.* And then "they must prove that the injury was caused by the defendant's antitrust violation." *Id.* "To establish an antitrust injury, a plaintiff must show not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred.'" *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (cleaned up).[3]

*Martino* is instructive. In that case, the district court pointed out that "the *fact* of damage question is distinct from the issue of actual damages." 86 F.R.D. at 147 (emphasis added). "Fact of damage pertains to the *existence* of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." *Id.* (emphasis added). And the court "presumes the ability to prove fact of damage without becoming enmeshed in individual questions of actual damage." *Id.* Here, the Defendants offer Kaplan and Harvey on the

[3]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*fact* of damage by rebutting Plaintiff's expert R. Craig Romaine, who plans to testify about the but-for world in which the fees paid by the Plaintiff would have been significantly lower, apart from calculating the extent of damages. Defs.' Opp. No. 2 at 11; *see* R. 206-2, Joint Proposed Pretrial Order, Exh. B (Plaintiff's Trial Witness List), at 1, 12–13. For example, Kaplan rebuts Romaine's opinion on the but-for world by opining "that the so-called but-for interchange rates in the absence of the alleged anticompetitive conduct would not be different." R. 243-14, Defs.' Opp. Exh. 13, Plaintiff's Proposed Trial Exh. No. PTX 1934, Kaplan Tr. at 19:1–20:10; *see also* Rs. 194-2, 243-13, Defs.' Opp. Exh. 12, Kaplan Rep. ¶ 933 ("In my opinion, for the reasons discussed herein, interchange fees in the but-for world would be the same or very similar to the amounts that existed in the actual world."); *id.* ¶¶ 233–47, 826–35, 838–42 (rebutting Romaine's version of the but-for world). This testimony is relevant during the liability phase of the trial.

On Harvey's testimony, the Defendants argue that he rebuts Romaine's version of the but-for world in a section of his report titled "Mr. Romaine's But-for World Is Reductive and Ignores Complicating Factors in the Actual World." Defs.' Opp. No. 2 at 12–13; Rs. 195-2, 243-16, Defs.' Opp. Exh. 15, Harvey Rep. ¶¶ 62–114. The Plaintiff first points out that Paragraphs 46–48 of Harvey's report are about his reliance on benchmarks created by expert witnesses from other opt-out lawsuits—which the parties have stipulated will not be offered at trial. Pl.'s Reply No. 2 at 9; *see* R. 237, Stipulation of Withdrawal of Plaintiffs' Motion in Limine No. 4. With that agreement in place, the Court excludes Harvey from testifying about Paragraphs ¶¶ 46–48 during the liability phase.

Next, the Plaintiff argues that Paragraphs 49–56 of Harvey's report address Harvey's calculation of damages using alternative time periods. Pl.'s Opp. No. 2 at 9; *see* Harvey Rep. ¶¶ 49–56. Because Paragraphs 49–56 of the report address alternative time periods for calculating damages, it is not relevant to the *fact* of damage, so the Court excludes those paragraphs from the liability phase of the trial. The Plaintiff also argues that Paragraphs 57–61 of Harvey's report critique the inclusion of non-domestic transactions in the Plaintiff's damages expert's calculations. Pl.'s Reply No. 2 at 9; *see* Harvey Rep. ¶¶ 57–61. This opinion too has no bearing on just the fact of damage, so it is excluded during the liability phase. Finally, the Plaintiff argues that Paragraphs 65–66 of Harvey's report is "not an expert opinion grounded in Harvey's expertise in mathematics," and thus cannot be characterized as relevant during the liability phase of the trial. Pl.'s Reply No. 2 at 9–10; *see* 2023 Harvey Rep. ¶¶ 65–66. But those two paragraphs rebut aspects of Romaine's but-for world—specifically his

hypothesis that merchants could steer the cardholders that do not have strong preferences about payment types—so they are relevant to the fact of damage. Harvey may testify about the opinions in Paragraphs 65–66.

The Defendants also argue that Paragraphs 152–55 and Paragraphs 158–165 of Harvey's report opines that "if the jury concludes that the cost of accepting Visa in the but-for world would be more like the actual cost of accepting known payment alternatives such as American Express, Discover, or Amazon Pay, Plaintiff[] will have failed to establish that their cost of acceptance would have been lower in the but-for world." Defs.' Opp. No. 2 at 13; *see* Harvey Rep. ¶¶ 152–55, 158–65. The Plaintiff argues that discussion of those costs is "entirely in the context of calculation of damages." Pl.'s Reply No. 2 at 10. That is partly right. The Court excludes the paragraphs in which Harvey opines that the Plaintiff's "damages would have been much lower or zero," Harvey Rep. ¶¶ 155, 160, 165, but allows the rest of the identified paragraphs because they are proper liability rebuttals to the Plaintiff's but-for world, *id.* ¶¶ 152–54, 158–59, 161–164 (discussing merchants' willingness to accept other forms of payment with higher costs than Visa credit or debit cards in the actual world and arguing that that acceptance undercuts the Plaintiff's expert's assumption that interchange rates would be lower in the but-for world).

Finally, the Plaintiff argues that in the alternative, if the Court holds that Kaplan's and Harvey's opinions are relevant to liability, then the opinions should still be excluded under Evidence Rule 403 due to the risk of undue delay, wasted time, and jury confusion as to the separate questions of liability and damages. Pl.'s Mot. No. 2 at 8. In the reply brief, the Plaintiff specifies that Kaplan's and Harvey's opinions should be excluded as unnecessarily cumulative. Pl.'s Reply No. 2 at 11–12. Although there may be some overlap between the experts' opinions, given the importance and complexity of this issue, the overlap is not substantially outweighed by wasted time or cumulativeness.

In sum, the Plaintiff's Motion No. 2, R. 201, is granted in part and denied in part. The motion is denied as to the parts of Kaplan's deposition testimony and report identified by the Plaintiff in the motion, and denied as to ¶¶ 65–66, 158–59, 161–164 of Harvey's report. The motion is granted as to ¶¶ 46–48, 49–56, 57–61, 155, 160, 165 of the report.

**Plaintiff's Motion in Limine No. 3 (Preclude Potential Future Changes to Payment-Card Markets).** The Plaintiff moves to preclude the Defendants from arguing or presenting evidence of (1) consumers or market participants suffering

future harm if the Plaintiff prevails at trial on their claims for damages; (2) future changes that would happen in the payment-card market if the Plaintiff prevails at trial; and (3) the fact that the Plaintiff is only seeking its own damages at trial (and thus not relief that would have a broader impact on the payment card market). R. 201, Pl.'s Mot. No. 3 at 10. Specifically, the Plaintiff points out that because they have been included in a mandatory Rule 23(b)(2) class, they can only seek past damages and not future relief, so any reference to future changes is irrelevant, and would result in unfair prejudice to the Plaintiff. *Id.* The Defendants respond that they do not plan to suggest to the jury that the Plaintiff is or ought to be seeking forward-looking injunctive relief, R. 243, Defs.' Opp. No. 3 at 16, but argue they must be able to respond to the Plaintiff's claim that the relevant market would be more competitive without the alleged misconduct, *id.* In the reply brief, the Plaintiff clarifies that it is seeking (1) an exclusion of predictions about how the payment-card markets and cardholders would change after and because of a verdict for the Plaintiff; and (2) a bar to keep Defendants from portraying the Plaintiff's inability to seek injunctive relief as being the result of corporate greed. R. 264, Pl.'s Reply No. 3 at 13.

Parties of course can offer evidence on but-for world models "as they concern historical conditions," but evidence or argument about injunctive relief and forward-looking changes is barred. *See In re NFL's "Sunday Ticket" Antitrust Litig.*, 2024 WL 1751781, at *2 (C.D. Cal. Apr. 17, 2024). And as discussed earlier in this order, the Defendants must be allowed to rebut the Plaintiff's version of the but-for world. *In re NFL's "Sunday Ticket" Antitrust Litig.*, 2024 WL 2075942, at *3 (C.D. Cal. May 7, 2024) (denying the defendants' motion to exclude opinions criticizing the defendants' expert's but-for worlds as "contradictory, lacking support, and having flawed factual premises"). But the Defendants cannot imply that a *jury verdict* in favor of the Plaintiff will result in any particular but-for world.

Turning next to the specific evidence at issue, the Plaintiff first argues that Kevin Murphy, one of the Defendants' expert witnesses, "spins doomsday scenarios about consumers having cards rejected and services diminished … due to the lack of the [Honor All Cards] rules and other Visa/Mastercard acceptance rules and practices." Pl.'s Mot. No. 3 at 10–11. In Paragraph 487 of his report, Murphy rebuts the Plaintiff's expert's conclusion that the elimination of the Honor All Cards rule and default interchange would not affect merchant acceptance because merchants and issuers would negotiate. R. 198, Murphy Rep. ¶ 487. Rebutting the Plaintiff's expert on this point is not an invocation of a "doomsday scenario," and there is no reason to exclude Murphy's opinion on that point. Next, Murphy goes on to explain that "the

elimination of [the Honor All Cards rule] might lead to lower merchant acceptance of networks' cards, or, in other words, to some significant fragmentation of existing card networks." *Id.* ¶ 488. He goes on to illustrate this point by hypothesizing that localized merchants may no longer accept cards issued by regional banks based in another part of the country, leading travelers to use other forms of payment. *Id.* Murphy also opines that without the Honor All Cards rule, "cardholders' cards would not be accepted as widely as the[y] currently are," leading cardholders to potentially carry other forms of payment. *Id.* ¶ 490–93. Murphy further opines that the elimination of the Honor All Cards rule will result in selective merchant acceptance, lowering the value created by the card network, and allowing merchants to refuse or surcharge cards. *Id.* ¶¶ 494–95. Again, these opinions directly rebut the Plaintiff's but-for world on liability, and must be allowed for the reasons discussed earlier in this Order. To be clear, the Defendants are not allowed to imply that any changes predicted by their experts will occur if the *jury* arrives at a verdict in favor of the Plaintiff. With that safeguard in place, no relevancy or Rule 403 stands in the way.

The Plaintiff also seeks to bar testimony from David Teece for similar reasons.[4] Pl.'s Mot. No. 3 at 11. In Paragraph 15 of Teece's report, he opines that "[i]gnoring the repercussions of making major changes to a complex financial ecosystem that undergirds the retail economy in the United States renders [the Plaintiff's experts'] analysis incomplete and flawed," and "the failure to discuss the potential impact on the ecosystem might even be considered *reckless*." R. 193, Teece Rep. ¶ 15 (emphasis added). On the first part of the opinion, which criticizes the analysis as "incomplete and flawed," there is no relevancy or Rule 403 problem. But the italicized characterization that the Plaintiff's expert's analysis is "reckless," is an inflammatory and unnecessary way of criticizing the opposing analysis. That particular characterization is excluded. With that exception, Teece's opinion is a direct rebuttal to the Plaintiff's version of the but-for world, and Teece is not opining about what might happen if the jury finds in favor of the Plaintiff. The Defendants' experts are allowed to testify that if the Honor All Cards rules never existed, certain benefits to cardholders would not have developed.

[4]Footnote 10 of Teece's report is a citation to "Industry Platforms and Ecosystem Innovation" published in *The Journal of Product Innovation Management*. Teece Rep. ¶ 21 n.10. Paragraph 78 of Attachment 3 refers to a material relied upon by Teece in the preparation titled, "Tokens are good for you. Want to know why?" *Id.* at 158. The Plaintiff does not explain how these two cited portions of Teece's report discuss "how altering [the Honor All Cards] rules 'would create dangerous fragmentation.'"

Finally, the Plaintiff argues that the Defendants should be precluded from pointing out that the Plaintiff is only seeking its own damages at trial. Pl.'s Mot. No. 3 at 12–13. The Defendants respond that they should be permitted to explain to the jury that the Plaintiff is seeking damages, and that they should not be barred from arguing about the Plaintiff's reason for seeking those damages. Def.'s Opp. No. 3 at 22. In reply, the Plaintiff clarifies that it only seeks to bar the inference that the Plaintiff chose to forgo broader relief or that their damages claim reflects greed. Pl.'s Reply No. 3 at 18–19. It is true that given the class action, the Plaintiff had no choice on forgoing injunctive relief, so the defense must not imply that the Plaintiff made that kind of choice. On damages, the Defendants may point out that the only damages at issue are the Plaintiff's specific damages, which is a proper way to ward off the concern that a jury (already having found liability) would be inclined to award damages beyond just the Plaintiff's. But a reference to "greed" is not likely to be supported by evidence, so it is excluded unless something unexpected happens at trial.

The Plaintiff's Motion No. 3, R. 201, is denied for the most part and granted in part. The Court sets the following guardrails:

- The Defendants will not suggest to the jury that the Plaintiffs are seeking or ought to be seeking forward-looking injunctive relief.

- The Defendants will not suggest to the jury that if the jury finds in favor of the Plaintiff, the examples discussed by the defense experts to rebut the Plaintiff's but-for world will actually occur.

- The Defendants may explain to the jury that the Plaintiff is seeking damages on its own behalf, but may not argue that the Plaintiff is doing so because of corporate greed.

**Plaintiff's Motion in Limine No. 4 (Preclude Expert Evidence Analyzing Benchmark Opinions of Expert Witnesses from Other Interchange Cases).** This motion has been resolved through stipulation. *See* R. 237, Stipulation of Withdrawal of Plaintiffs' Motion in Limine No. 4.

**Plaintiff's Motion in Limine No. 5 (Exclude Evidence of Pass-On).** The Plaintiff seeks to preclude the Defendants from introducing evidence that the Plaintiff "passed on" supracompetitive interchange fees to its customers, relying on the decision in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).

R. 201, Pl.'s Mot. No. 5 at 18. The Defendants respond that the Plaintiff will put the contested evidence at issue themselves, and that the Defendants "are prepared to agree that *no party* should be permitted to argue that merchants pass through higher interchange or network fees in the former of higher retail prices to consumers." R. 243, Defs.' Opp. No. 5 at 24 (emphasis in original). In the reply, the Plaintiff clarifies that it is only seeking to bar the Defendants from using pass-on evidence for the purpose of "reduc[ing], offset[ting], or eliminat[ing] the overcharge damages Plaintiff[] can recover," and that the Plaintiff does not seek to limit use of pass-on evidence in the liability phase. R. 264, Pl.'s Reply No. 5 at 21. Because the ships passed in the night, the Court then directed the Defendants to submit a sur-reply on their position as to use of pass-on evidence during the liability phase, R. 294, 08/24/2026 Minute Entry; R. 337, Defs.' Sur-Reply No. 5. In the sur-reply, the Defendants argue that the Plaintiff's expert should not be permitted to testify about pass-on at all, but if allowed to, then the Defendants should be allowed to rebut this evidence. *Id.*

In *Hanover Shoe*, Hanover, a shoe manufacturer, alleged that United Shoe Machinery had violated § 2 of the Sherman Act by leasing and refusing to sell its shoe machinery, thus monopolizing the shoe-machinery industry. 392 U.S. at 483. Hanover argued that it should be allowed to recover "the difference between what it paid United in shoe machine rentals and what it would have paid had United been willing during the relevant period to sell those machines." *Id.* at 483–84. United responded that if overcharged buyers charged their customers a higher price because the price to the buyer was higher, then the buyer suffers no loss from the overcharge. *Id.* at 491. The Supreme Court rejected this argument, holding that defendants in antitrust cases were not entitled to assert a passing-on defense. *Id.* at 494. So the law is well-established that antitrust defendants may not seek to decrease the amount of damages recoverable by the plaintiff by asserting a pass-on defense. *See Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir. 2002) ("*Hanover Shoe* allows the first purchaser to recover the whole overcharge even if some was passed on to its customers."); *see also Loop LLC v. CDK Global, LLC*, 2025 WL 71870, at *3 (W.D. Wis. Jan. 10, 2025) (holding that the defendant may not present evidence of pass-on charges and argue that damages should be reduced because of those charges).

Applied here, that means that the Defendants cannot, during the damages phase, introduce pass-on evidence in an attempt to reduce recoverable damages. But at the liability phase, it is permissible for the *Plaintiff* to introduce evidence that the interchange fees—which it seeks to prove are supracompetitive and thus a basis for liability—is passed on to consumers. The Plaintiff is of course entitled to offer

evidence that absent the default interchange fees, consumers would be better off. If the Plaintiff introduces that evidence, however, then the Defendants can rebut it. David Kaplan, one of the Defendants' experts, opines in rebuttal that "the evidence advanced by Romaine does not support the conclusion that any such savings related to interchange or network fees necessarily would be used by merchants to reduce prices to consumers, and substantial evidence supports the conclusion that they would not." Kaplan Rep. ¶ 45; *see also id.* ¶ 125 ("As discussed below, various … Plaintiffs also testified to using cost savings to increase profits or buy back stock, for example."); *id.* ¶ 748 ("[A] firm's profit margins are a relevant consideration as to whether input costs get passed through to consumers, and the issue of possible pass-through is directly relevant to Romaine's claims related to the development of the but-for world."). At the liability stage, responsive defense evidence is allowed on this point. If the trial moves on to the damages phase, then the Court can instruct the jury that the pass-on evidence is not relevant to reducing damages.

**Plaintiff's Motion in Limine No. 6 (Preclude Evidence of Alternative Payment Forms, Such As Wright Express).** This motion has been resolved through stipulation. *See* R. 331, Stipulation of Withdrawal of Plaintiffs' Motion in Limine No. 6.

**Plaintiff's Motion in Limine No. 7 (Bar Defendants from Referring to Charitable Contributions and Other "Good Acts" Evidence).** The Plaintiffs seek to exclude evidence of the Defendants' past or future "good acts," such as charitable contributions, arguing that the evidence is irrelevant, violates Rule 403, and is also barred by Evidence Rule 404. R. 202, Pl.'s Mot. No. 7 at 5. In response, the Defendants argue that the motion should be denied because it seeks to exclude relevant evidence and limit the Defendants' ability to rebut the Plaintiff's arguments about the Mastercard Foundation purportedly maintaining an unlawful conspiracy. R. 243, Defs.' Opp. No. 7 at 32. The Defendants also argue that they should be allowed to rebut any evidence that the Plaintiff presents of the Defendants' bad corporate character, and that they do not intend to introduce or offer evidence of charitable donations or corporate character otherwise. *Id.* at 32, 33. In the reply, the Plaintiff argues that the Defendants should not be allowed to "smuggle" in evidence of Mastercard's "good character" as part of the dispute over the Defendants' IPOs, R. 264 at 26–30, and that the Defendants fail to identify what "good acts" evidence could permissibly rebut, *id.* at 30–31. Finally, the Plaintiff argues that under Evidence Rule 403, the balance tips in favor of exclusion. *Id.* at 32.

Evidence Rule 404 instructs that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). The Plaintiff is correct that courts regularly exclude "good acts" evidence to show evidence of "good character" on grounds of irrelevance and improper-character evidence. *See, e.g.*, *Equal Employment Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc.*, 2022 WL 17978822, at *5–6 (S.D. Ga. Dec. 28, 2022) (holding that the defendant cannot rely on evidence of its general "good" corporate character to show that it acted in conformity with that character); *Feighan v. Res. Sys. Grp. Inc.*, 2023 WL 4623123, at *10 (D.D.C. July 19, 2023) ("Applying Rule 404 to corporations is consistent with the interests served by the general bar on admissibility of character evidence since such evidence tends to district the trier of fact from the main question of what actually happened on the particular occasion." (cleaned up)); *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 854 (W.D. Va. 2018) (preventing the defendant from "adduc[ing] evidence or argument related to its own good, company-wide reputation, its unrelated 'good' or charitable acts," and other corporate practices that are unrelated to the case). The Defendants argue that they do not intend to present evidence of this ilk for this particular purpose, so the Plaintiff's motion is granted as to general good-character evidence.

Rather, the Defendants argue that they must be allowed to introduce evidence of charitable donations to rebut the Plaintiff's argument that Mastercard established a charitable foundation to allegedly maintain an unlawful antitrust conspiracy. Defs.' Opp. No. 7 at 34–36. This more-specific requires a closer look at the pieces of evidence that the Plaintiff takes issue with.

First, the Plaintiff target what they characterize as a draft Mastercard media release and a related email on Mastercard Inc.'s contributions to the Mastercard Foundation, a charitable organization that originated from Mastercard gift stock. Pl.'s Mot. No. 7 at 5; *see* R. 204-6, Pl.'s Mot. Exh. F; Defs.' Proposed Trial Exh. No. DTX-1531. The email and attached press release discuss contributions (and the amounts of those contributions) that Mastercard has made to the Mastercard Foundation, as well as Mastercard's contributions to various other organizations. Pl.'s Mot. Exh. F at 2–3. That same document includes statements about the Mastercard Foundation's mission, its program areas and funding priorities, and the relationship between Mastercard and the Mastercard Foundation. *Id.* at 3–6.

In response, Mastercard argues that this evidence is relevant because Mastercard's IPO allocated certain company shares to the Mastercard Foundation, and that the Plaintiff intends to argue at trial that this allocation of stock is evidence that Mastercard continues to engage in an alleged conspiracy with its issuing banks. Defs.' Opp. No. 7 at 34–36. So the Defendants plan to rebut this allegation with evidence of the Mastercard Foundation's purpose, and the allocation of Mastercard stock to the Mastercard Foundation, in addition to evidence that Mastercard's IPO "substantially altered [its] preexisting ownership and governance structure, including by divesting the banks from their ownership interests and authority, and instead vesting decision-making authority in independent directors and transferring the bulk of the banks' ownership to public shareholders." *Id.* at 33, 34–35.

There is a balance to be struck here: if the Plaintiff introduces evidence that the Mastercard Foundation is a vehicle through which Mastercard implements the allegedly unlawful restraints, then Mastercard must be allowed to rebut that evidence. So Mastercard may introduce evidence of the overall amounts of the Foundation's charitable giving. But the evidence must be redacted to remove (and any corresponding testimony must omit) references to the specific recipients of contributions, such as Junior Achievement Worldwide, the United Negro College Fund, the Hispanic College Fund, the American Red Cross, and so on, to avoid unfair prejudice under Evidence Rule 403, Pl.'s Mot. Exh. F at 3, 6, 8, 13. The rebuttal of the evidence is probative, but evidence of the specific donees raises the prospect of the jury giving weight to good corporate character.

Next, the Plaintiff challenges meeting materials for a Mastercard Board of Directors meeting that included a presentation about the Mastercard Foundation. Pl.'s Mot. No. 7 at 5; R. 204-7, Pl.'s Mot. Exh. G at 53–77; Defs.' Proposed Trial Exh. No. DTX-1864. Again, Mastercard is allowed to present evidence to rebut the Plaintiff's argument that the Mastercard Foundation is part of an alleged conspiracy with the issuing banks, but the evidence must be redacted to remove the specific donees, partnerships, and outcomes (for example, the partnership with the Africa CDC, *id.* at 55, various partnerships with other African organizations, *id.* at 58–59, program partners for the Mastercard Foundation Scholars Program Partners, *id.* at 69–70, and the impact stories, *id.* at 73–77).

The Plaintiff points out that Visa also designates exhibits containing information about its charitable giving efforts. Pl.'s Mot. at 5–6. These include a slide from a presentation that describes the assets and reach of the Visa Foundation, R. 204-8, Pl.'s Mot. Exh. H; Defs.' Proposed Trial Exh. No. DTX-1346, and a Schedule 14A

Securities and Exchange Commission filing that describes how much money the Visa Foundation contributed to pandemic relief and small business recovery, R. 204-9, Pl.'s Mot. Exh. I. It appears less certain that the Plaintiff is going to target the Visa Foundation like it will the Mastercard Foundation. If (and only if) the same targeting arises at trial, then Visa (like Mastercard) can present evidence of the overall giving but not specific donees.

The Defendants also argue that they should be allowed to rebut evidence or argument on profitability and corporate character with admissible contextual evidence. Defs.' Opp. No. 7 at 36–37. This argument is not convincing. Evidence that the Defendants were highly profitable is relevant to the Plaintiff's claims, but at the same time does not risk characterizing the Defendants as "bad" corporate citizens. What the Defendants did with the profits is not relevant to rebutting evidence that the Defendants were highly profitable.

In sum, Plaintiff's Motion No. 7, R. 202, is granted in part and denied in part. Mastercard may rebut the Plaintiff's argument that Mastercard created the Mastercard Foundation to maintain an unlawful conspiracy with evidence of its contributions and the respective amounts of those contributions, as long as that evidence (and testimony) is redacted as described above. And the Defendants may not rebut evidence of profitability with evidence on how profits were spent on charitable contributions.

**Plaintiff's Motion in Limine No. 8 (Exclude Cumulative Expert Evidence).** The Plaintiff seeks to prevent the Defendants from presenting cumulative expert testimony, arguing that this would risk the jury basing its verdict on the quantity rather than the quality of expert testimony. R. 202, Pl.'s Mot. No. 8 at 9. The Defendants respond that their experts do not offer "repetitive" opinions "because they address the same key industry, market dynamics, and competition issues in this case," and that "each expert offers specific, distinct opinions within his or her area of expertise that are critical to Defendants' presentation at trial." R. 243, Def.'s Opp. No. 8 at 38. In the reply, the Plaintiff argues that Rule 403 "turns on the effect of the evidence on the jury and on trial management, not on whether Defendants can assign different academic labels to duplicative proof or … come up with different 'lenses' or 'assignments' in an effort to justify admittedly repetitive opinions." R. 264, Pl.'s Reply No. 8 at 33.

Under Rule 403, "[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates." *United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000) (cleaned up). Presenting multiple expert witnesses on the same subject "amounts to the needless presentation of cumulative evidence," and also carries a risk of unfair prejudice. *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 2018 WL 1316724, at *2 (N.D. Ill. Mar. 14, 2018). "A trial should not reduce itself to an exercise of counting up and comparing the number of witnesses who testify for each side on a particular topic." *Id.* And "whether or not … two experts have different perspectives does not diminish the fact that … two experts … will render essentially the same opinions." *Kaepplinger v. Michelotti*, 2022 WL 267886, at *5 (N.D. Ill. Jan. 28, 2022) (cleaned up). So the Court begins from the general presumption that cumulative evidence should be avoided.

That being said, in a case featuring this level of complexity, overlap of expert testimony is not completely avoidable because the parties need to orient the jury as to the issues. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011) (describing the three-part framework that district courts use in considering whether to admit expert testimony, which includes whether the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue). Overlap on the same topic but grounded in different expertise does not necessarily run afoul of Evidence Rule 403. The Court will consider limitations on exam hours to avoid cumulative evidence, but the Plaintiff's motion is otherwise denied for now. *See United States v. Bases*, 2021 WL 6621286, at *8 n.6 (N.D. Ill. July 1, 2021) (describing objections that testimony is cumulative under Evidence Rule 403 as "better offered at trial"); *Brennan v. BNSF Ry. Co.*, 2022 WL 10337824, at *4 (W.D. Wis. Oct. 18, 2022) (denying the defendant's motion in limine on cumulative expert testimony but cautioning that "both parties should be aware that unreasonably duplicative and cumulative testimony will not be admitted at trial").

**Plaintiff's Motion in Limine No. 9 (Bar Commercials or Other Advertisements as Evidence).** The Plaintiff seeks to bar the Defendants from introducing commercials and advertisements as irrelevant, and also under Rule 403, Rule 703, and the hearsay rules. R. 202, Pl.'s Mot. No. 9 at 16. The Defendants argue that the commercials are admissible because they "go to the core issue in this case: competition in the relevant two-sided markets for transactions." R. 243, Defs.' Opp. No. 9 at

52. The Defendants also argue that they will not present the commercials and advertisements to "prove the truth of what the advertisements say," so the evidence is not hearsay. *Id.* at 57. Finally, the Defendants argue that their experts should not be precluded from testifying about the commercials and advertisements under Evidence Rule 703. *Id.* at 58. In the reply, the Plaintiff argues that commercials and advertisements do not relate to their claim that Visa and Mastercard "separately manages an unlawful agreement that suppresses competition among its member banks for credit and debit card transactions." R. 264, Pl.'s Reply No. 9 at 40, 41–45. The Plaintiff also points out that the advertisements do not shed any light on the but-for world, *id.* at 45, and that the Defendants' arguments about the commercials being non-hearsay highlight the irrelevancy of the evidence, *id.* at 46.

The specific evidence at issue includes several Visa commercials with public figures, such as Deion Sanders, Mos Def, Derek Jeter (the New York Yankees legend and greatest shortstop of all time), Terry Bradshaw, and popular entertainment icons, not to mention Bugs Bunny and Daffy Duck. Pl.'s Mot. No. 9 at 16; *see* DTX-4052; DTX-4053; DTX-4125; DTX-4054; DTX-4126. The Plaintiff is right that these specific ads and commercials are not relevant. The Defendants argue that the advertisements are relevant because they show competition in the relevant markets for transactions, but there are infinite ways to show competition without these specific ads and commercials, which contain many more statements beyond competition-relevant ones. What's more, the Plaintiff is not arguing that the Defendants' practices resulted in less competition between the card networks themselves. Pl.'s Reply No. 9 at 41.

Even if the specific ads and commercials had some probative value, Rule 403 problems abound. The endorsements by celebrities, sports figures, and beloved cartoon characters are designed to elicit favorable emotions from potential customers, and the same reaction might arise in the jury. The substantial risk of unfair prejudice far outweighs any probative value.

Finally, the Plaintiff argues that the same Rule 403 concerns apply if the Defendants' experts to testify about the Defendants' commercials and advertisements. Pl.'s Mot. No. 9 at 20. But expert testimony about commercials and advertisements do not have the same risk of unfair prejudice as showing the evidence to the jury, and the Plaintiff agrees that the Defendant's expert can "identify the advertising campaigns she considered, describe their themes, and explain how they informed her opinions." Pl.'s Reply No. 9 at 48–49. So that kind of testimony on commercials and

advertisements is permitted, so long as the Defendants do not show the jury the specific ones. The Court grants Plaintiff's Motion No. 9, R. 202.

**Plaintiff's Motion in Limine No. 10 (Exclude Evidence Testimony of Non-Party Witnesses, Including Deposition Testimony of Rule 30(b)(6) Witnesses Who Did Not Testify from Personal Knowledge and Testimony of Witnesses Who Were Deposed Before Plaintiff Filed its Lawsuit).** The Plaintiff seeks to prevent the Defendants from introducing evidence and testimony about the activities of non-party merchants, including those who have settled, and deposition testimony taken before this case was filed. R. 202, Pl.'s Mot. No. 10 at 21. The Plaintiff also argues that the Defendants' designations of testimony from Civil Rule 30(b)(6) depositions of non-party merchants should be excluded under Evidence Rule 602 unless the Defendants show that the witnesses testified from personal knowledge. *Id.* And according to the Plaintiff, depositions taken before they filed this action should be precluded under Civil Rule 32(a) and Evidence Rule 804(b)(1). *Id.*

In response, the Defendants argue that the evidence the Plaintiff seeks to exclude is relevant to multiple issues, and the probative value of the evidence is not substantially outweighed by any Rule 403 concern. R. 243, Defs.' Opp. No. 10 at 59. They also argue that the Plaintiff was represented by class counsel "or … by a party with the same motive to develop the testimony" when the MDL 1720 deposition testimony was taken, so it is admissible under Civil Rule 32(a) or Evidence Rule 804(b)(1). *Id.*

More specifically, the Plaintiff challenges non-party merchant depositions on topics like the non-party merchant's payment-acceptance practices and experiences with interchange and transaction fees. *Id.* at 21–22. The Defendants also seek to present testimony from an Amazon witness, who testified about direct negotiations over interchange and acceptance terms and whether Amazon tried to negotiate directly with issuers. *Id.* at 22. Some of the designated depositions that the Plaintiff contests were taken in 2008 and 2009—around a decade before this suit was filed in November 2019. *Id.* at 22, 25–26; *see* Charles Doyle Dep. Tr. (Dec. 12, 2008); Peter Dunn Dep Tr. (Apr. 17, 2008); Richard Fairbank Dep. Tr. (Apr. 7, 2009); Eric Fox Dep Tr. (Apr. 2, 2008); Steven Freiberg Dep. Tr. (Nov. 20, 2008); Timothy Healy Dep. Tr. (May 7, 2008); Alan Heuer Dep. Tr. (Oct. 16, 2008); Jamie Landheer Dep. Tr. (Feb. 28, 2008); Stephen McCurdy Dep. Tr. (Mar. 24, 2009); Glenda McNeal Dep. Tr. (Apr. 22, 2009); Siddharth Mehta Dep. Tr. (Oct. 1, 2008); Steven Rathgaber Dep. Tr. (Feb. 17, 2009).

As an initial matter, excluding all testimony from all non-party merchants just because they are non-parties would mistakenly exclude relevant testimony. As the Defendants point out, evidence of real-world non-party merchant negotiations with issuing banks is directly relevant to rebutting the Plaintiff's but-for world. Defs.' Opp. No. 10 at 60–64; *see also Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, 2023 WL 5647204, at *4–6 (N.D. Ill. Aug. 31, 2023) (declining to exclude evidence of non-party grocers' preferences for eggs certified through an industry program because the plaintiffs' theory was that "there was a conspiracy to reduce the total supply of eggs," and the defendants "can present evidence that they were responding to consumer demand from buyers of shell eggs" (cleaned up)). And the rule of reason requires courts to assess "the restraint's actual effect on competition," with the goal of "distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Amex*, 585 U.S. at 541 (cleaned up).

To support its position, the Plaintiff cites *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 658 (7th Cir. 2002), arguing that the Seventh Circuit has rejected the idea that negotiated discounts by certain buyers negates collusion by defendants who allegedly engaged in anticompetitive practices. Pl.'s Mot. No. 10 at 23. But *In re High Fructose Corn Syrup* involved price fixing, 295 F.3d at 653–54—a *per se* violation of the Sherman Act—so there was no need to conduct a rule-of-reason analysis, which is necessary in this case. So the relevance requirement is satisfied as to non-party merchants' negotiations with issuing banks.

The Court next turns to the issue of whether the Rule 30(b)(6) depositions designated by the Defendants are admissible without a showing of personal knowledge. Pl.'s Mot. No. 10 at 24–25. Rule 30(b)(6) allows parties to depose a corporation through one or more representatives of the corporation's choice, and the "persons designated must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). A witness testifying as a Rule 30(b)(6) witness may "testify not only to matters within his personal knowledge but also to 'matters known or reasonably available to the organization.'" *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004) (cleaned up). To be used at trial, deposition testimony must be "used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." Fed. R. Civ. P. 32(a). And the Evidence Rules require evidence that a witness has personal knowledge of a matter before they are able to testify to that matter. Fed. R. Evid. 602. Having said that,

a witness may gain personal knowledge over the course of preparing for a Rule 30(b)(6) deposition from non-hearsay materials, like company policies. *See Kraft Foods Global, Inc.*, 2023 WL 5647204, at *12 ("Many courts have recognized that a Rule 30(b)(6) witness can gain personal knowledge when preparing for the deposition, and thus satisfy the Rule 602 requirement for personal knowledge through that route."). So, although the Court generally agrees that a Rule 30(b)(6) deposition of a non-party is inadmissible at trial unless the witness had personal knowledge, the required knowledge can arise from preparing for a Rule 30(b)(6) depositions. Any party offering Rule 30(b)(6) depositions must carry the burden of demonstrating that the deponents had personal knowledge, and the Court will address the testimony on a witness-by-witness (and topic-by-topic) basis as needed.

On the issue of whether the Defendants can introduce non-party testimony from depositions that were taken before the lawsuit was filed, the Plaintiff has the better of the argument. Parties may use "[a]t a hearing or trial, all or part of a deposition" against another party if "the party [that the deposition is being used against] was present or represented at the taking of the deposition or had reasonable notice of it." Fed. R. Civ. P. 32(a). Evidence Rule 804(b)(1)(B) also states that former testimony is not excluded by the rule against hearsay if the declarant is unavailable as a witness if the testimony "is now offered against a party who had—or in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(B).

Here, the Plaintiff was not represented at the taking of the depositions listed in its motion, Pl.'s Mot. No. 10 at 26, and the Court finds unconvincing the Defendants' assertion, Defs.' Opp. No. 10 at 69, that the Plaintiffs were represented at the depositions because they were members of a *proposed* class. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233–34 (2d Cir. 2016) (holding that the divergent interests of the (b)(3) and (b)(2) class required "separate counsel when it impacts the essential allocation decisions of plaintiffs' compensation and defendants' liability" (cleaned up)). The Defendants also argue that the Plaintiffs seek to use 2008 and 2009 deposition testimony, but this usage does not run afoul of Civil Rule 32(a) and Evidence Rule 804(b)(1)(B) because the *Defendants* were present at the depositions and had the opportunity to cross examine the deponents.

For the reasons discussed above, the Court grants in part and denies in part Plaintiff's Motion No. 10, R. 202. The Defendants may not use testimony from depositions where the Plaintiff was not represented. And the Defendants must satisfy the personal-knowledge requirement before presenting testimony from Rule 30(b)(6)

depositions, although the requirement may be satisfied via preparation for the deposition. But the Court rejects wholesale exclusion of evidence of the activities of nonparty merchants, including those who have settled.

**Plaintiff's Motion in Limine No. 11 (Preclude Drawing Parallels Between the Two-Sided Payment Card Platforms Operated by Defendants and the Food Delivery Platform Operated by Grubhub).** Because this motion only concerns evidence concerning Grubhub's business operations, and Grubhub has settled, the motion is moot.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 30, 2026